The facts pertinent to the points involved in the appeal are as herein set out: *Page 225 
The action was brought by Chas. W. Bell against William A. Danzer, Cleveland A. Trantum, Robert M. Rupp, and Troy I. Herring for the recovery of $17,500, with interest thereon from 16 March, 1918, representing the par value of $17,500 of a $25,000 issue to Chas. W. Bell of the capital stock of the White Lake Lumber Company (a proposed corporation), which the defendants had contracted and agreed to purchase from the said Chas. W. Bell under the provisions of a certain contract and agreement entered into between the plaintiff and said defendants, dated 16 March, 1918, and referred to in the complaint and the entire evidence in the case as Exhibit A.
The defendants denied liability and pleaded that they had already performed the obligation of the contract, Exhibit A, and further alleged that said stock which the plaintiff, Chas. W. Bell, was seeking to force the defendants to purchase was in fact the property of the Bell Lumber Company and not the property of Chas. W. Bell, and that because of certain fraud practiced by the said Bell Lumber Company in the sale of its timber holdings to the defendants, promoters of the White Lake Lumber Company, to whom deed was afterwards actually made by the Bell Lumber Company, and on account of the loss of the title to certain of the tracts of timber sold because of the failure of the Bell Lumber Company to keep the same alive by payment of the extension moneys, which covenant on the part of the Bell Lumber Company was guaranteed by the plaintiff, Chas. W. Bell; and that by reason of certain wrongful acts whereby the value of the stock was depreciated, the plaintiff was not entitled to recover anything. On 8 March, 1921, and prior to answer filed by the defendants to the original action, the defendants Danzer and Herring filed a petition, wherein they alleged that the White Lake Lumber Company was the beneficiary under the contract, Exhibit A, and that all the things required of said contract to be done and performed by the plaintiff had not been done and performed, and that thereby the White Lake Lumber Company had suffered damages, and that the said White Lake Lumber Company was a necessary party to the suit.
An order was made allowing the White Lake Lumber Company to be made a party defendant, and also at May Term, 1922, an order was made making the Bell Lumber Company and J. Scott Bell and S. Earle Bell parties. On 15 August, 1922, the White Lake Lumber Company filed its cross-bill and complaint against Chas. W. Bell, S. Earle Bell, J. Scott Bell, and the Bell Lumber Company. The Complaint alleges several items of damages as follows:
(a) That the Bell Lumber Company had breached the contract, Exhibit A, in that it had failed to keep alive the title to various tracts of *Page 226 
the timber sold by paying the annual extensions provided for in the deeds of conveyance, which covenant on the part of the Bell Lumber Company the said S. Earle Bell and Chas. W. Bell had guaranteed, and that by reason thereof the title to various tracts had been lost and the said White Lake Lumber Company has suffered damage to the extent of $15,000.
(b) That the said Bell Lumber Company, Chas. W. Bell, J. Scott Bell, and Earle Bell had fraudulently represented to the original defendants, promoters of the White Lake Lumber Company, and also to said company, that the timber holdings of the Bell Lumber Company, constituting the Turnbull Group, was a reasonably compact body of timber and that the tracts thereof adjoined and were contiguous, and that the rights and easements necessary in cutting and removing the same extended from tract to tract so that no difficulty would be experienced in extending a tram road from tract to tract; that these representations were false; and that after the institution of the original action the said Chas. W. Bell, acting for himself, the Bell Lumber Company, J. Scott Bell, and S. Earle Bell, for the purpose of hindering, delaying, defeating and blocking the operations of the White Lake Lumber Company, bought and secured in the name of the said Chas. W. Bell and his relations, and found title to such tracts of timber in the Turnbull Group as were most necessary and desirable to the operations of the White Lake Lumber Company, including certain rights-of-way leases, and that by reason of said conduct the operations of the White Lake Lumber Company had been seriously impeded and interfered with, and that said company thereby had been forced to expend large sums of money in buying rights of way and other timber necessary to connect up said Turnbull Group, and its mill had been forced to close down on account of the inability to get logs; that it had lost the title to certain other timber owned by it but not bought from the Bell Lumber Company, all of which damages were placed at $17,500, thus making a total of $42,500 which the White Lake Lumber Company sought to recover of the Bell Lumber Company, S. Earle Bell, J. Scott Bell, and Charles W. Bell.
The Bell Lumber Company, Chas. W. Bell, S. Earle Bell, and J. Scott Bell filed an answer to the cross-bill of the White Lake Lumber Company, in which they denied that there had been any fraud practiced in the original negotiations and sale by the Bell Lumber Company of its timber holdings to the original defendants, promoters of the White Lake Lumber Company, or to said company, but that the said original defendants, promoters, made a full investigation of the timber which the said Bell Lumber Company was selling before the *Page 227 
contract, Exhibit A, was entered into, and it was thoroughly understood by both sides that the said Turnbull Group, as well as the Colly Group, was not a connected body of contiguous tracts of timber.
The answer to cross-bill further alleged that the obligation on the part of the original defendants, Danzer, Trantum, Rupp and Herring, was a personal covenant on their part to purchase the $25,000 capital stock of Chas. W. Bell in the White Lake Lumber Company, and was in no way dependent upon the covenant of the Bell Lumber Company to secure the extensions of time and assurances of title called for in said contract, Exhibit A, and the deed executed pursuant thereto. Said answer further denied that the White Lake Lumber Company had lost title to any of the timber conveyed or contracted to be conveyed.
Chas. W. Bell admitted that after the defendants Danzer, Herring, Trantum, and Rupp had refused to purchase and pay for his stock, and after the institution of his original action, that he reentered the territory in which the timber sold by the Bell Lumber Company to the White Lake Lumber Company was located and purchased timber, timber rights, etc., as he had the right to do, but that in so doing he was not animated by any ill-will or ill feeling towards the White Lake Lumber Company or its promoters, and not for the purpose of hindering and blocking the said White Lake Lumber Company in its operations, but with the title to said tracts the said Chas. W. Bell thought that he would be better enabled to negotiate a satisfactory adjustment of the matters between himself and the original defendants. The other respondents, Bell Lumber Company, J. Scott Bell and S. Earle Bell, denied connection with the activities of said Chas. W. Bell in said territory after the institution of his suit, and it is alleged that the said Chas. W. Bell himself tendered the White Lake Lumber Company title to all of his holdings in said territory at actual cost plus interest from date of purchase, which he alleged was the reasonable value of said property. All other allegations of the cross-bill and damages alleged were denied.
At August Term, 1922, by a consent order, the cause was referred, and the referees heard said cause in full and filed their report 8 January, 1923.
Chas. W. Bell filed exceptions to the report as did also the White Lake Lumber Company and the defendants Trantum, Rupp, Danzer, and Herring; and said cause came on for hearing before his Honor, Judge Calvert, at March Term, 1923, of the Superior Court of Sampson County, upon the exceptions. After full hearing his Honor allowed the White Lake Lumber Company to amend its cross-bill so as to allege that the action of Chas. W. Bell was malicious. His Honor adopted *Page 228 
the findings of fact of the referees with certain modifications and made the following additional findings:
1. That there were no false or fraudulent representations made or fraud practiced by the Bell Lumber Company, or its officers or agents, to Troy I. Herring, W. A. Danzer, Robert M. Rupp or C. A. Trantum, promoters of the White Lake Lumber Company, in the negotiation, sale and conveyance by the Bell Lumber Company to said parties and the White Lake Lumber Company of the timber, timber rights, etc., covered by the deed executed pursuant to the contract of 18 March, 1918, marked Exhibit A.
2. That the $25,000 capital stock issued to Chas. W. Bell is and was the $25,000 capital stock which the defendants Trantum, Rupp, Danzer and Herring agreed to purchase under the terms of said contract, Exhibit A.
3. That the acts of Chas. W. Bell, as set out in the ninth finding of fact by the referees, were done wilfully and maliciously.
4. At the time Chas. W. Bell was doing the things and committing the acts referred to in the ninth finding of fact by the referees, he had not himself complied with that portion of the contract, Exhibit A, in which he guaranteed personally and individually to pay the annual extension moneys from year to year. On account of this failure, title to some of the tracts of timber had lapsed and the titles to other tracts were endangered. As early as August, 1919, W. A. Danzer and his associates notified Chas. W. Bell of this situation and demanded of him strict performance of this portion of the contract; but Bell did the things and committed the acts set out in the ninth finding of fact by the referees before complying with the provisions of the contract with reference to the extensions and other assurances of title, and did not comply with said provisions of the contract until August, 1922.
5. Except as herein modified, all exceptions to the findings of fact by the referees are hereby overruled, and such findings are approved and adopted by the court as its own.
The material part of the judgment follows: It is considered and adjudged:
1. That the plaintiff, Chas. W. Bell, have and recover of the defendants, C. A. Trantum, W. A. Danzer, Robert M. Rupp, and Troy I. Herring, the sum of $17,500, with interest thereon from 1 August, 1922, until paid.
2. That the White Lake Lumber Company have and recover of Chas. W. Bell the sum of $5,000, with interest thereon from the first day of March Term, 1923, of Sampson Superior Court.
3. That the White Lake Lumber Company have and recover nothing from the Bell Lumber Company, J. Scott Bell, and S. Earle Bell, *Page 229 
and that said defendants go without day and recover their costs of the White Lake Lumber Company.
The date of the contract is 16 March, 1918; the date of the deed to the White Lake Lumber Company is 6 August, 1918.
There are two assignments of error:
1. That his Honor erred in allowing recovery of $5,000 damages in favor of the White Lake Lumber Company against Chas. W. Bell.
2. That his Honor erred in failing to allow interest on the recovery of $17,500 from 16 March, 1918, the date of the contract, Exhibit A.
After he had demanded the repurchase of his stock and had instituted this action, but before the Bell Lumber Company had procured an extension of time for the cutting and removal of the timber, the plaintiff purchased leases, easements, and timber on other tracts of land over which the defendants wanted rights of way, and thereby caused the defendants to buy additional timber and rights of way at a price in excess of their market value; to build additional tracks; to replace others, and from time to time to shut down their mills. (Ninth finding of facts.)
The defendants admitted that the plaintiff had a legal right to acquire the timber and easements for a lawful purpose, but contended that his purpose was unlawful; that he had guaranteed performance of the Bell Company's covenant to get an extension of time within which the defendants might cut the timber; that neither he nor the company had procured such extension; and that he sought by unlawful means, while declining to respect his own contract, to make the defendants comply with theirs.
The plaintiff's specific or primary object was to compel Danzer and his associates to pay for his stock, and to this end he attempted to hinder and delay the White Lake Company, in which they were interested, by making the purchase referred to. This purchase in itself was not unlawful. The question is whether it was made so by the taint of wilfulness and malice, or, stated in general terms, whether a lawful act becomes unlawful when actuated by a malicious motive. The words "wilfully and maliciously," as used in the judgment, evidently import a bad motive, an act done with intent to injure, or an act which without regard to motive would not have amounted to a civil wrong.
In Keeble v. Hickeringill, 103 Eng. Rep., 1127 (11 East, 574), one of the oldest cases on the subject, Holt, C. J., made this broad *Page 230 
statement: "Where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases." But in Allen v. Flood, 17 Eng. Rul. Cas., 320, Lord Watson said: "Assuming, what to my mind is by no means clear, that Keeble v.Hickeringill was meant to decide that an evil motive will render unlawful an act which otherwise would be lawful, it is necessary to consider how far that anomalous principle has been recognized in subsequent decisions. Laying aside the recent decisions which are under review in this appeal, only one case has been cited to us in which the Court professed that they were guided by the reasoning of Holt, C. J. That instance is to be found inCarrington v. Taylor, 11 East, 571 (11 R. R., 270), a decision which I venture to think that no English Court would at this day care to repeat. . . . To my mind the case is of considerable importance, because it shows that in the year 1809 the Court of Queen's Bench did not regard Keeble v.Hickeringill as establishing the doctrine that a lawful act, done with intent to injure, will afford a cause of action." And further: "Although the rule may be otherwise with regard to crimes, the law of England does not, according to my apprehension, take into account motive as constituting an element of civil wrong. Any invasion of the civil rights of another person is in itself a legal wrong, carrying with it liability to repair its necessary or natural consequences, in so far as these are injurious to the person whose right is infringed, whether the motive which prompted it be good, bad, or indifferent. But the existence of a bad motive, in the case of an act which is not in itself illegal, will not convert that act into a civil wrong for which reparation is due. A wrongful act, done knowingly and with a view to its injurious consequences, may, in the sense of the law, be malicious; but such malice derives its essential character from the circumstance that the act done constitutes a violation of the law. There is a class of cases which have sometimes been referred to as evidencing that a bad motive may be an element in the composition of civil wrong; but in these cases the wrong must have its root in an act which the law generally regards as illegal, but excuses its perpetration in certain exceptional circumstances from considerations of public policy."
In this country the decisions in which the question has been discussed are not uniform. Variety of opinion appears, not only in tribunals of different jurisdictions, but not infrequently among judges of the same court. In some instances this diversity of opinion no doubt grew out of the distinction between cases in which the defendant, although impelled by a bad motive, exercised his own rights without interfering with the legal rights of the plaintiff and cases in which a *Page 231 
legal right of the plaintiff was infringed, and in other instances it perhaps came from a failure to observe the distinction between the exercise of absolute rights and the exercise of rights which are qualified or relative. But with comparatively few exceptions the American cases hold that the exercise of a right which does not infringe the legal right of another is not actionable even when prompted by malice, or that the motive is immaterial if the defendant's act was otherwise lawful. That this principle has been variously expressed will be made to appear by reference to a few excerpts. "An act which is lawful in itself and which violates no right cannot be made actionable because of the motive which induced it. A malicious motive will not make that wrong which in its own essence is lawful." Guethler v. Altman, 84 A.S.R. (Ind.App.), 313. "If an act be lawful — one that the party has a legal right to do — the fact that he may be actuated by an improper motive does not render it unlawful."Bohn Man. Co. v. Hollis, 40 A.S.R. (Minn.), 319, 323. "The exercise by one man of a legal right cannot be made a legal wrong to another." Cooley on Torts, 685.
The facts in the instant case do not involve approval of the broad doctrine that if a person has the lawful right to do a thing the act remains essentially lawful when committed under any conceivable motive, because in the present case the plaintiff's specific or primary purpose was not to injure the defendants, but to benefit himself. Tuttle v. Buck, 16 Ann. Cas. (Minn.), 807, and note; Lancaster v. Hamburger, 1 Ann. Cas., 248;Tennessee Coal Co. v. Kelly, 163 Ala. 348; Union Labor Hospital Assn. v.Vance Lumber Co., 33 L.R.A. (N.S.), 1034; note to Gray v. BuildingTrades Council, 103 A.S.R., p. 499; note to Globe Ins. Co. v. Fireman'sIns. Co., 29 L.R.A., 673, and note; Haywood v. Tillson, 46 A. R. (Me.), 373; Oglesby v. Attrill, 105 U.S. 605; 26 Law. Ed., 1186.
Our own decisions are in accord with this doctrine. In Richardson v. R.R., 126 N.C. 100, the Court held that malice disconnected with the infringement of a legal right cannot be the subject of an action. The same conclusion was reached in S. v. Van Pelt, 136 N.C. 634, in which numerous authorities were cited, and again in Biggers v. Matthews, 147 N.C. 300, in which Haskins v. Royster, 70 N.C. 601, and Jones v. Stanly, 76 N.C. 355, were distinguished. Barger v. Barringer, 151 N.C. 433, was decided on the principle that a person should not be permitted to use his property for the malicious purpose of injuring his neighbor when no benefit accrues to himself; and the plaintiff's recovery was allowed on the ground that he had been injured by the defendant's erection of a private nuisance. That decision is not *Page 232 
in conflict with the doctrine maintained in the other cases cited, as a perusal of the opinion will show; for it is there expressly said, "We see no difficulty in principle in limiting an owner's right so far that he shall not be permitted to use his land in a particular way, with no other purpose than to damage his neighbor."
By applying the doctrine set forth in the foregoing decisions to the facts appearing in the instant case we are convinced that the defendants cannot maintain an action against the plaintiff to recover damages resulting from his purchase of the timber and easements. He had the legal right to make the purchase, and if in the exercise of such right he maliciously attempted incidentally to hinder and delay the work of the White Lake Lumber Company, he nevertheless intended primarily to benefit himself by compelling Danzer and his associates to perform their contract by paying the remainder due for the plaintiff's stock.
The second assignment of error is his Honor's failure to allow interest from 16 March 1918 (the date of the contract), on the amount recovered by the plaintiff. The allowance of interest from 1 August, 1922, was based on the finding that the plaintiff did not comply with his contract until that time. Unless the general rule is modified by this finding, interest should be allowed from the date of the contract. C. S., 2309, 2998; Chatham v.Realty Co., 174 N.C. 671; Bond v. Cotton Mills, 166 N.C. 20.
In our opinion the facts do not modify the general rule. True, the Bell Lumber Company contracted to sell its property to the proposed incorporators or to any proposed incorporation of whatever name, and several months later made a conveyance thereof to the White Lake Lumber Company. The original agreement to pay the extension money was then merged or incorporated in the conveyance. Certainly after the execution of this deed there were two independent contracts; the plaintiff had contracted with the White Lake Lumber Company to pay the extension money and Danzer and his associates had contracted to buy the plaintiff's stock. Their failure to pay for the stock in accordance with their contract cannot be justified on the ground that the plaintiff had committed a breach of his contract with the White Lake Lumber Company. Neither the delay of the Bell Lumber Company to pay the "extension money" nor the plaintiff's failure to do so constituted a breach of the plaintiff's contract with those who had agreed to buy his stock. He was ready to deliver the stock and it was the duty of the purchasers to make payment; and on account of their refusal to do so, the plaintiff is entitled to interest from the date of the contract. *Page 233 
In this connection it may be noted that before the hearing the "extension money" was paid up to and including the month of August, 1922.
The judgment is modified by allowing interest on the plaintiff's recovery from the date of the contract, and by vacating and setting aside the judgment recovered against the plaintiff by the White Lake Lumber Company for $5,000 and interest, and as thus modified it is affirmed.
Modified and affirmed.